ALVORD et al. v. SMITH & WATSON IRONWORKS et al.

(District Court, D. Oregon. July 27, 1914.)

No. 6145.

1. PATENTS (§ 66*)—ANTICIPATION—PRIOR PATENT.
   The date when a patent is actually issued, rather than the date when the application therefor was filed, determines whether or not it anticipates another patent.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 79, 81; Dec. Dig. § 66.*]

2. PATENTS (§ 66*)—ANTICIPATION—PRIOR PATENT.
   A patent in suit is not anticipated by another patent which, although prior in date, was not issued until after the filing of the application for the patent in suit, unless it is shown that the invention of the prior patent was in public use prior to such application.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 79, 81; Dec. Dig. § 66.*]

3. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—HOISTING OR LOGGING DEVICE.
   The Corbett patent, No. 807,109, for a hoisting or logging device, the invention consisting specifically of clutch-operating mechanism for throwing in and out of operative engagement a friction band and friction cone, was not anticipated, but shows a marked advance in the art. Also held valid as against the claim that the patentee was not the original and first inventor of the device, and infringed.

4. PATENTS (§ 209*)—LICENSE—CONSTRUCTION OF CONTRACT.
   A contract between the patentee of the patent in suit and a defendant who was the owner of another patent, both relating to improvements of the same machine, by which they agreed to combine their inventions in a new machine, which each should be at liberty to make and sell, paying the other a royalty, construed, and held not to operate as a license to defendant to use the invention of the patent in suit otherwise than in the new form of machine agreed upon.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 300, 303; Dec. Dig. § 209.*]

In Equity. Suit by William C. Alvord, administrator, and Ethel W. Corbett, administratrix, of William H. Corbett, deceased, against the Smith & Watson Ironworks and Edward Turney. On final hearing. Decree for complainants.

Hugh C. Lord, of Erie, Pa., and Reed & Bell, of Portland, Or., for plaintiffs.

T. J. Geisler, of Portland, Or., for defendants.

---

WOLVERTON, District Judge. William H. Corbett in his lifetime secured certain letters patent, of date December 12, 1905, and numbered 807,109, upon a hoisting or logging device, of which he claimed to be the original and first inventor. The supposed invention is well illustrated by the following drawings, figure 3, containing the elements of the invention claimed:

The drum arrangement is carried on a shaft, journaled in bearings $a'$, the shaft being supplied with a gear $C$, which by other suitable gearing is connected with the engine. This gear carries a friction-cone $c$, and, one end of the drum being provided with a friction-band $d$, the drum is caused to revolve with the shaft by bringing the friction-band $d$ into engagement with cone $c$ by a thrust imposed by the device of which Corbett claimed to be the inventor, and thus the drum is utilized, through means of rope or wire cable, for drawing, hauling into place, or lifting objects of great weight. The drum is released when the

thrust is withdrawn, by means of a spring $E$, and ceases again to revolve with the shaft. These elements, namely, the cone $c$ and the friction-band $d$, constitute the friction-clutch. Further, to illustrate how the thrust is imposed upon the drum, a key $G$ extends through a slot $b$ extending through the shaft, which engages collar $F$. This in turn engages the end of the drum opposite the end containing the clutch arrangement, and the whole is driven endwise into engagement by a thrust exerted by means of the pin $H$ upon the key $G$.

So far as the drum and its mechanism are concerned, including the slot in the shaft and the key and collar, there is no present claim for invention. It is only to the device for the operation of this drum mechanism that the claim pertains.

Corbett's specific invention consists of the carrier $I$, threaded on the end of the shaft $B$, to the outer end of which is bolted a flange-plate $I'$, this flange-plate forming a shoulder $i$ on the inside of the carrier opposite the end of the shaft. This carrier is sometimes called a sleeve, either designation being appropriate, as some one or more of its elements is taken into account.

A nut $J^2$, referring to figure 3, is journaled in the flange-plate $I'$, which has a shoulder $j^4$ opposed to and facing shoulder $i$ formed by the flange upon the sleeve. Between these shoulders are interposed two disks or washer-plates, between which are roller-bearings. The rollers are held in place by a spreading-ring $j^7$, which has but the one purpose. The plates are of very hard material. The nut $J^2$ is internally threaded, and is locked against rotation by means of clamp $K$, which, having an arm $k$, is secured to some part of the frame. This nut so adjusted is called the fixed screw member. It does not revolve with the shaft, although carried on it, but the carrier or sleeve revolves about and outside of it, and always with the shaft. Within the threaded cavity of this fixed screw member is inserted a screw $L$ on the outer end of which is adjusted a lever with which to operate the screw. This is called the active screw member. A socket is provided in the inner end of the screw, in which is inserted a pin $l'$. This pin co-operates with another or floating pin $l^6$, and the latter with the thrust pin $H$ which extends through the center of the shaft longitudinally free to rotate, and engages the key $G$, extending crosswise through the slot $b$, and is thus brought into engagement with the drum. In operation, the lever is thrown forward, which advances the active screw member, and through the pins $l'$, $l^6$, and $H$, the drum friction-band is thrust upon the friction-cone, and locked, thus enabling it to take the coil of the cable and draw the load desired. When the screw is advanced, the shoulders of the fixed screw member are drawn back against the shoulders of the sleeve or carrier, and the latter, revolving with the shaft, causes friction at the shoulders. By reason of the great power exerted by the fixed screw member on the thrust, the friction becomes so intensified at the shoulders and at the contact of the pins as to generate heat to such an extent sometimes as to cause a welding, and, to provide against heating, the roller-bearings were introduced, and the thrust-pin divided into three or more parts, which seems to have solved the problem. In unlocking the mechanism, the lever is simply thrown back to place.

Twelve claims are made under the patent, of which Nos. 1, 2, 5, and 12 are invoked to sustain the allegations of the infringement. No. 1 is as follows:

"In a hoisting or logging device the combination with the main bearings; the shaft journaled in said bearings and having an attaching end; a driving friction-wheel mounted on said shaft; a drum mounted on said shaft; a driven friction-wheel locked against rotation relatively to said drum, said driving and driven friction-wheels being adapted to be brought into frictional engagement by an axial movement of one of them; thrusting devices in the attaching end of the shaft, extending from without the bearing to within the bearing; and a connection between said thrust devices and the one of the friction-wheels free to move axially into engagement; of an apparatus mounted on the attaching portion of the shaft for actuating said thrust devices, comprising a carrier attached to the shaft; a relatively fixed screw member mounted on the carrier, the carrier being arranged to receive the axial thrust of said screw member; means for locking said relatively fixed screw member from rotating with the carrier; an active screw member operating in connection with the relatively fixed screw member, and adapted to exert a thrust on said thrust devices."

No. 2 is a repetition of the first, with an additional element in words, "And a roller-bearing between said relatively fixed screw member and the carrier."

No. 5 has the additional element, "And a loose pin interposed between said active screw and said thrust devices."

No. 12 varies the last part of No. 1 to read as follows:

"Of an apparatus mounted on the attaching portion of the shaft for actuating said thrust devices comprising a screw member fixed against axial movement relatively to the shaft, said screw member being mounted outside of the bearing, the shaft being free to rotate without rotating the screw member; and an active screw member arranged to operate with said relatively fixed screw member for exerting thrust on the thrust devices."

The alleged infringing device consists in a nut, circular in form, screwed on the end of the shaft and revolving with it, which extends beyond the circumference of the shaft, forming a shoulder outside of it. The fixed screw member extends beyond the shaft in which the active screw member is adjusted, co-operating with a thrust-pin extending through the shaft and forming an engagement with the drum device. The fixed screw member also extends back, in a sleeve arrangement or carrier, over the circular nut, and, closing in on the shaft, forms a shoulder opposing the shoulder on the nut. Between these shoulders are two disks, and between these roller-bearings like those in the Corbett patent. The circular nut, as stated, revolves with the shaft, but within the sleeve of the fixed screw member, which latter remains stationary, thus reversing the order as found in the Corbett patent, where the nut or sleeve revolves about the fixed screw member. When the fixed screw member is brought into engagement with the thrust-pin and drum by means of a lever adjustment, as in the Corbett patent, the shoulder of the fixed screw member is brought into engagement with that of the circular nut, and the latter revolving and the other not causes friction at the point of contact, which the disks and roller-bearing device interposed are designed to obviate.

The plaintiffs, having succeeded to the Corbett patent, bring this suit to declare the Smith & Watson Iron Works, which, it is alleged, is or has been manufacturing the last described device, an infringer of the Corbett patent. The defendant E. Turney, who claims a right to this device, and also a license, by virtue of a certain contract with Corbett, to manufacture and sell under the latter's patent, has been permitted to intervene. Three defenses are interposed, namely: (1) Anticipation of the Corbett patent, by several patents previously issued to Turney. These are patent No. 607,557, for friction-clutch, of date July 19, 1898; No. 680,900, for friction-clutch, August 20, 1901; No. 709,567, for clutch-operating mechanism, September 23, 1902; No. 728,521, for clutch-operating mechanism, May 19, 1903; and No. 760,089, for mechanism for operating friction-clutches, May 17, 1904. (2) Prior discovery by Turney of the primary invention, and disclosure to Corbett. And (3) license by Corbett to manufacture and sell the device.

Preliminarily, it is not to be questioned that the Smith & Watson Iron Works has been manufacturing the alleged infringing device. It is submitted, however, that it is manufacturing for E. Turney, that E. Turney pays $50 for each machine, and immediately sells to the company for $60, and that the company utilizes the same upon its logging engines. But the testimony of Smith, who was called as a witness for defendants, leads to the conclusion that the ironworks is manufacturing by permission of Turney, and pays Turney a royalty for each machine manufactured. Such is the virtual effect of the arrangement to which Smith testifies, and to call it by any other name would not change the relationship.

The defense of anticipation requires an inquiry respecting the state of the prior art at the time of Corbett's alleged invention. The last-named patent, No. 760,089, pleaded as anticipatory of the Corbett device, cannot be so considered, for the reason that its date is subsequent to the date of Corbett's application. By reference to the two patents, it will be found that Turney made application September 4, 1903, and his patent was issued May 17, 1904, while Corbett's application bears date November 4, 1903, and his patent December 12, 1905. Thus, while Corbett's patent issued later than Turney's, his application was prior to the latter's patent.

[1] The third defense which may be interposed to infringement under the statute (R. S. § 4920 [U. S. Comp. St. 1901, p. 3394]) is that the device had been patented or described in some printed publication prior to the patentee's supposed invention or discovery thereof, or more than two years prior to his application for patent. In order to sustain this defense the patent produced for the purpose must have been duly issued, or a complete description of the invention published in some printed publication, prior to the patented invention in suit.

"And the patent offered in evidence or the printed publication," says the Supreme Court, "will be held to be prior, if it is of prior date to the patent in suit, unless the patent in suit is accompanied by the application for the same, or unless the complainant introduces parol proof to show that his invention was actually made prior to the date of the patent, or prior to the time the application was filed." Bates v. Coe, 98 U. S. 31, 33 (25 L. Ed. 68).

As stated in another of the cases:

"An application prior to the patent in suit can have weight only if there has been some actual use of the invention, so that there may be elements of publicity. Such an application cannot be said to be a part of the prior art unless this element of publicity is present." Thomson-Houston Electric Co. v. Ohio Brass Co. (C. C.) 130 Fed. 542, 546.

And so, in a later case, it is concluded that:

"Under the authorities, the date when the patent is actually issued, rather than the date when the application therefor was filed, determines whether or not it anticipates another patent." General Electric Co. v. Allis-Chalmers Co. (C. C.) 190 Fed. 165, 170.

See other authorities there cited.

[2] Corbett's application is in evidence, and its filing shows an earlier date than patent No. 760,089, which is sufficient to render the latter unavailable as an anticipation of Corbett's invention. There is no evidence of any use by Turney of his device under patent No. 760,089 prior to the date of Corbett's application.

[3] Now, as to the prior art. The first Turney patent for friction-clutch, No. 607,557, has a nut screwed on the end of the shaft, which becomes a part of and rotates with it. In the end of this nut is inserted an adjusting screw corresponding with the active screw member in later patents, to which is attached at the outer end a hand-wheel. The adjusting screw co-operates with a slidable pin extending through the center of the shaft, and engages a key in a slot of the shaft, which engages the drum. The adjusting screw rotates also with the shaft. The thrust on the pin for locking the drum is effected by a brake-shoe brought into contact with the hand-wheel, which retards the action of the hand-wheel and screw; while the shaft continues its revolutions, so that the screw moves inwardly to engagement with the pin and the drum, and thus the latter is locked. To unlock the drum the engine must be stopped, and the hand-wheel and screw turned back to their previous position. The principle involved by the art is that the entire interlocking mechanism revolves with the shaft, and the locking is effectuated by retarding the action of the adjusting screw, thus producing engagement of the parts with such force as to cause the drum to revolve also with the shaft. The shaft in its revolutions, including the engine which propels it, must be stopped, or its speed reduced, and the hand-wheel and screw must be readjusted, in order to unclutch the drum.

The next Turney patent for friction-clutch, No. 680,900, involves a construction similar to the first as it relates to the nut and the adjusting screw member, but it has an improvement, consisting of a complex mechanism, whereby the adjusting screw may be advanced by retarding its revolutions, and released by accelerating its movement to greater rapidity than the rotation of the shaft, and may be so regulated while the shaft is in motion as to pay out the cable on the drum at the desired rate of speed. The principle involved in the locking device is the same as in the former patent, with the added improvement for effectuating the locking and unlocking and regulating the paying out of the cable while the shaft is in motion.

Turney's patent No. 709,567, for clutch-operating mechanism, exhibits a locking device which is not wholly carried on the shaft, as in the former devices, but the active screw member is contained in a fixed screw member, which latter is screwed to the base of the engine, and is separate from the shaft; that is, it is not carried on the shaft. The active screw member, or the adjusting screw, as it is called in the former patent, is operated by a lever in conjunction with a pull-rod. When advanced, which is done by a side thrust, it co-operates with a pin adjustment passing through a nut screwed upon the end of the shaft, and thence through the center of the shaft longitudinally to an engagement with the drum mechanism. The particular feature which differentiates this device from the two former is that the fixed screw member and the active screw member are carried on a standard affixed to the bed of the engine, and are not carried on the shaft and nut attached thereto, but are independent thereof; the thrust becoming a side thrust from an independent source, not exerted directly through mechanism contained upon the rotating shaft.

Turney's patent No. 728,521 for clutch-operating mechanism also covers an invention of the same type, in so far as the fixed and active screw members are carried by a frame affixed to the bed of the engine, and not by the shaft, the primary distinction between the two later patents as compared with the two earlier.

Another device, called the "Standard Friction Device," which is characterized as very old and having been in use prior to Corbett's invention, has been brought into the case. This device, like the last two patents of Turney, carries the fixed and active screw members by independent attachment. In it there is a shaft-nut, with a shoulder, and the thrust-nut, which is the fixed screw member, extends back of the shaft-nut, with a shoulder also, so that when the thrust screw is advanced the shoulders are brought into frictional contact. The evidence shows that, so great is the friction generated at the face and point of contact between the shoulders and the end of the thrust screw with the thrust pin, a welding heat is sometimes generated, in the heavy logging that is now carried on, which constitutes a very great objection to the operation of the device.

Now, a comparison of the Corbett device with these devices reveals a marked advance in the art in several particulars: First, the thrust nut and screw are carried on the shaft and as a part of it; second, they do not revolve with the shaft, which eliminates the necessity of retarding the screw member in order to set the screw, or of stopping the engine or accelerating the screw member in order to unlock the drum; third, it affords ample convenience and facility for lubricating; and, fourth, the friction is largely eliminated by the disks and roller-bearings between them, and by the introduction of a loose pin or pins between the active screw member and the thrust-pin. All these cannot be regarded as having been suggested by the prior art. Hence I conclude that there has been no anticipation as it respects the Corbett patent.

The next question is a more difficult one, and pertains to the invention itself. It is, Who was the original and first inventor of the broad and essential distinction, that is to say, the manifest and obvious ad-

vance in the art that we have attempted to explain? It is in effect conceded that the Turney device No. 760,089 and the Corbett device No. 807,109 practically embody the same primary invention, in so far as it is covered by the Corbett patent, that is, the idea of carrying the locking device wholly upon the drum shaft, and of providing fixed and active screw members which do not revolve with the shaft. The difference between the two patents is essentially and simply this: That in the Corbett device the active screw member is threaded on the inside of the fixed screw member, while in the Turney device No. 760,089 the active screw member is threaded on the outside of the fixed screw member. The difference is not functional, and is not so considered. It is not claimed that the Corbett device infringes any of the claims of the Turney patent No. 760,089. While Turney might have broadened his claims to cover Corbett's primary invention, for some reason he did not do so.

There has been intimation that Corbett surreptitiously and in bad faith obtained his patent in contravention of the prior rights of Turney. This feature will be dealt with as we go forward with the examination of the main question.

Corbett was the manager of the Willamette Ironworks (later the Willamette Iron & Steel Works), which was engaged, among other things, in the manufacture of logging engines and locking devices for logging purposes. Turney was, for a long time, employed by the company in selling the locking devices, at a salary of $20 per week and a commission. Indeed, all the experimental work upon Turney's several devices was done at the company's shops, except as it relates to his last patent, No. 760,089. The drawings for this were made by Harry Turney, the son of E. Turney, at the Turney residence.

Recurring again to the Corbett device, the patent was issued December 12, 1905, and the application was filed November 4, 1903. From certain exhibits contained in the record, consisting of drawings showing the device, and upon which the patent was probably based, it is quite certain that Corbett had evolved his device some time prior to June 20, 1903. A shop file-mark on the drawing shows this date, and the evidence shows that it was completed some time earlier, but how much does not appear. Later drawings bear date August 11, 1903, which were completed some time earlier than that. These drawings show a completed device, and practically the device that Corbett patented. So it may be said that his invention dates back to June 20, 1903, and not later than August 11th of that year. E. Turney claims that he heard nothing of Corbett's invention until long after his (Corbett's) application was filed, namely, some time in 1904 or 1905. But he frankly admits that he is confused as to dates, and does not claim to state them accurately, except where the records fix them for him. Turney is evidently mistaken as to the time of his first knowledge of Corbett's device, which was early known as the "Universal Friction Device," for it is in evidence that Corbett began manufacturing his device even prior to filing his application for patent, which, as we have seen, was November 4, 1903. Further than this, the Willamette Iron & Steel Works

issued a catalogue, which was in print as early as December 1st of that year. This catalogue contains Corbett's device, and also a cut of E. Turney & Son's combination lever friction device—not the device claimed under patent No. 760,089, but that claimed under the earlier patent, No. 728,521. There is some dispute as to this, but it is borne out by the fact that there was never one of the devices under patent No. 760,089 manufactured for the market at the Willamette Iron Works, but a number of those under 728,521 were manufactured there. And the purpose of publishing the cut was to advertise the machine, and to continue the manufacture of the same. Turney was all this time in the employ of the Willamette Iron Works, specially delegated and engaged in selling these devices, that is, the Universal and No. 728,521.

We come now more particularly to the device No. 760,089. The principle is invoked on the part of the plaintiffs that the date of the filing of the application must be taken as the time when the invention is constructively reduced to practice, and therefore the burden is cast upon the party claiming an earlier invention of showing that such invention was actually made prior to that date. In the present controversy, however, the defendants have introduced patent No. 760,089; and, not only this, they have introduced the file-wrapper (which was done, under leave of the court, after the evidence had been closed), showing that the application for such patent was filed September 4, 1903, an earlier date than the filing of Corbett's application. Applying the rule, therefore, which plaintiffs invoke, the burden is cast back upon them to show that Corbett's invention was evolved prior to the date of Turney's application. This makes the legal issue clear.

E. Turney testifies that he had all his work done in making friction devices at the Willamette Iron & Steel Works, excepting the gear, referring to the device in 760,089, which he made at a little shop of his own. He and his son started getting out the drawings in 1902, and the work ran into 1903. He and Corbett were friendly, and he discussed his ideas with regard to improvements freely with Corbett. Defendants' Exhibit G, which is one of the drawings made during the development of his device, represents the first drawing in the course, with others introduced. This he showed to Corbett along in the fore part of 1903. Exhibit H does not show the device covered by patent No. 760,089, but Exhibit I does. A blueprint of this latter was sent to his attorneys for applying for patent. His son made the drawing "along about the latter part of 1903." Turney showed the drawing to Corbett before sending the blueprint to his attorneys. "That was along in the latter part of 1903, somewheres along in there." Corbett approved of the device, and said it was "just what we had been trying to get." Turney further states that he first found out that Mr. Corbett was making an application for a patent somewhere along in 1905. With respect to the time he showed the drawing to Corbett, it was "anywhere from ten months to a year, or something like that, after that." In fact, the witness says, "Corbett saw all my drawings and approved of them." When asked if there was ever any dispute between them respecting the devices covered by the two patents, he answered:

"There was a dispute there over it all the time. * * * I told him he had no right—he had nothing there; it was simply my part of my patent. He said we would see, and he meant we would see when he got his patent."

Harry Turney testifies in effect that he made the drawings for the device, patent No. 760,089. They were made at the residence of his father and himself. He and his father showed them to Corbett first along in the spring of 1903. He showed Corbett a blueprint of device marked "Exhibit G." He showed Exhibit H to Corbett along about the same time, and Exhibit I about the time of applying for patent, but before. Corbett thought the idea was all right, but said nothing about having invented an improvement of his own. The first time witness heard of the "Universal" was probably in the winter of 1903–1904. The drawings were around the shop, and the device was being manufactured. Corbett did not talk to him about any dispute.

Mr. Charles E. Mack, who was in the employ of the Willamette Iron & Steel Works at the time, testifies that the device shown in patent No. 760,089 was first brought to his attention by Harry Turney, at the Turney residence, prior to the issuance of the patent, but he "couldn't say how long it was." He remembers the fact of Corbett having drawings made in the Willamette shop as represented in patent No. 807,109, and saw them on the drawing-board. This was about the same time he was informed of the Turney invention. He saw the Turney drawings first, but does not know when the Corbett tracings were drawn. He is under the impression that the experimental work was done on the Turney device first. On further examination witness states he saw tracings "G" and "H" some time in the spring of 1903. He also saw Exhibit I, but could not fix the day or month, but it was in warm weather of the same year, within two or three months after seeing the first drawings.

Analysis of the testimony is attended with much uncertainty as to the particular time when Turney had arrived at a clear and intelligent idea of his alleged invention, that is, as to just when he had sufficiently evolved his concept to reduce it to a definite and perfected device. He and his son and Mack seem to agree that the earlier tracings were gotten out some time in the spring of 1903. These were Exhibit G and Exhibit H. But Exhibit I, according to the statements of Turney and his son, was the one of final development. It is this of which the blueprint was made, and shown to Corbett, and transmitted to Turney's attorneys for procuring the patent. The son says the blueprint was made of "G," but in this he is probably mistaken, for it does not appear that a blueprint was made of more than one of them, and that was most likely of Exhibit I. Turney says his son made the drawing Exhibit I "along in the latter part of 1903, somewheres along in there," and that Corbett approved of the device, and said it was just what he had been trying to get. Further he says he first knew of Corbett's application along in 1905, which was anywhere from ten months to a year after he showed Corbett the drawing, which corroborates his statement that it was along in the latter part of 1903 that he showed the blueprint to Corbett. Harry Turney thinks they showed "G" and "H" to Corbett along in the spring of 1903, and Exhibit I about the

time of applying for a patent, the patent being applied for September 4th. The testimony, therefore, as it respects the last exhibit, is perfectly consistent with the idea that Corbett had first invented his device and perfected his concept by the 11th of August, and most certainly, if the date be carried back to the 20th of June. Mack saw "G" and "H" some time in the spring of 1903 and Exhibit I in the warm weather, within two or three months, he thinks, after seeing the first drawings, but could not fix the day or the month. It is necessary, therefore, to refer back to the testimony of Turney and his son to fix any probable date.

Resting the controversy here, it would yet be far from clear as to who first conceived the device comprising the broad and primary idea of the invention. But the doubt, to my mind, is satisfactorily and conclusively resolved by the fact that Turney did not embody the idea in his claims under his patent. Turney and Corbett undoubtedly consulted much together during all the time that these inventions were in course of development. Turney was, as we have seen, in the employ of the Willamette Company, and undoubtedly had access to Corbett's drawing-room, and in all probability saw all the drawings with reference to the Corbett patent as they were being developed. Turney says that Corbett saw all his drawings and approved them, thus showing a condition of confidence and trust between them. If that condition existed relative to the Turney device, it is fair to presume that it existed as to the Corbett device also. Corbett is dead, and is not here to testify, and we get only one side of the case. Notwithstanding the confidential relations, Turney says, "There was a dispute there over it all the time." If this be so, it speaks against Turney's position, for he says he knew nothing of Corbett's application until in 1905. Furthermore it shows that Turney had full and ample notice of Corbett's claim. Yet, having that notice, he failed to broaden the claim under his patent to include the device, as Corbett did. Mr. Justice Bradley, who was a most learned and profound patent jurist, in Miller v. Brass Co., 104 U. S. 350, 352 (26 L. Ed. 783), says:

"But it must be remembered that the claim of a specific device or combination, and an omission to claim other devices or combinations apparent on the face of the patent, are, in law, a dedication to the public of that which is not claimed. It is a declaration that that which is not claimed is either not the patentee's invention, or, if his, he dedicates it to the public."

Further illustration of the principle is to be found in Hutchinson v. Everett et al. (C. C.) 26 Fed. 531.

Considering the relations that existed between these parties at the time, it is highly probable that Turney knew of Corbett's invention, and was willing to concede it to him, and his action in not claiming the device accords perfectly with that idea. Turney was working out new mechanical ideas all the time, and obtaining patents from the government, and it is fair to presume that he was not dedicating any of his inventions to the public. The device unquestionably was apparent on the face of the patent, and yet he did not apply for a reissue. Had his claims included the device, a contest would have been brought on by the filing of Corbett's application for patent, and the matter would have been settled before the Commissioner of Patents; or had he ap-

plied for a reissue, the result would have been the same. This goes to show unmistakably that, if Corbett was not the original and first inventor, Turney was conceding the fact to him. But it is more probable that Corbett was the first inventor, and Turney, in their then friendly relations, was willing to concede to him what was justly his right, and hence the applications for the two patents were made as they were, and the patents in due time issued with the respective claims as made. I am impressed that no bad faith whatever can be attributed to Corbett in the premises.

Another fact which tends to strengthen the view thus entertained is that Turney and his son and Corbett entered into a contract for a combination of certain elements of the Corbett device with certain of those of Turney's invention, forming another contrivance called the "Turbett." The contract is of date August 31, 1906, a date subsequent to the issue of all of the patents. At that time both parties were fully apprised of what each was claiming, and yet the Corbett patent was made a subject of the agreement, and thus Turney recognized its entire validity. Other acts of Turney might be mentioned conducing to the same inference and conclusion, but it is unnecessary to extend the inquiry. I am impelled irresistibly to the conclusion that Turney was not the original and first inventor of the device, but that Corbett was.

[4] The last problem is respecting the meaning and effect of the contract of August 31, 1906. In this contract E. Turney and H. Turney are named as the parties of the first part and W. H. Corbett as the party of the second part. The contract then proceeds:

"That whereas the said parties of the first part are the owners of certain inventions and letters patent of the United States relative to what is known as the E. Turney & Son Combination Friction Device, and the said party of the second part is the owner of certain inventions and letters patent, known as the Willamette Universal Friction Device; and, whereas the parties hereto have agreed to combine the use of the said inventions and manufacture a friction device for logging and hoisting engines which shall be a combination of the two said patents, and shall be known as the 'Turbett Friction Device' upon the conditions and respective rights and interests of the parties as hereinafter mentioned: It is now therefore mutually agreed between the parties that the minimum selling price of the said new device embodying such combination of the two patents before mentioned and which is to be known as the 'Turbett Friction Device' shall be sixty ($60.00) dollars and the maximum price shall be seventy-five ($75.00) dollars until otherwise mutually agreed between the parties hereto.

"The interests of the respective parties in the said Turbett Friction Device shall be as follows: The party of the second part shall have the right to manufacture the said device at the Willamette Iron & Steel Works, Portland, Oregon, and for all of the said devices so manufactured and placed upon engines manufactured by the Willamette Iron & Steel Works after the 6th day of July, 1906, the said party of the second part shall pay or cause to be paid to the said parties of the first a royalty of five ($5.00) dollars for each and every one so manufactured, placed and sold.

"It is further understood and agreed between we the parties hereto that for any and all of the said devices manufactured and sold by the said party of the second part to be placed on any other engines than those manufactured by the Willamette Iron & Steel Works after the 6th day of July, 1906, the said party of the second part shall pay or cause to be paid to the said parties of the first part a royalty of ($10.00) dollars for each and every one of the said devices.

"The said parties of the first part shall have the full right to manufacture the said Turbett Friction Device and shall pay to the said party of the second part five ($5.00) dollars royalty for each and every one manufactured, sold and placed upon engines, except as hereinafter provided.

"It is further understood that the provisions herein defined as determining the payment of royalties shall not apply to the sale of the Turbett Friction Device by one of the parties hereto to the other, but they may be sold to each other at any reasonable price agreed upon, but all sales to third parties shall be subject to the payment of the royalties as hereinbefore mentioned.

\*     \*     \*     \*     \*     \*     \* .     \*     \*     \*

"It is hereby mutually understood and agreed between the parties hereto that the above combination of the said two patents and the manufacture therefrom of the Turbett Friction Device is for the mutual benefit of the parties to this contract and that neither of the parties hereto without the written consent of the other shall have the right to sell or dispose of any rights, interests or property therein whatsoever or hire or let any interest or right in the said Turbett Friction Device to any person, company or corporation whatsoever without the mutual consent of the other in writing."

The clauses omitted provide for an accounting between the parties and its binding effect upon them, their heirs, etc.

Some controversy seems to have arisen, and the contract resulted as a settlement of their differences.

Turney seems to be impressed that both devices, namely, No. 728,521 and No. 760,089, were the subject of the contract on the part of himself and his son, while it is claimed, on the other hand, that it is the former device only that was in contemplation. The terms of the contract show, however, that the combination was of two patents, and not three, and, taking the entire testimony into account, there can scarcely be a doubt that these two were the Turney patent No. 728,521 and the Corbett patent No. 807,109. Several machines had been made in pursuance of the composite device before the contract was entered into, and it is a matter of moment to ascertain the elements of such device, and which of them were taken from the Turney device and which from Corbett's. This is settled by Turney's own testimony, as follows:

"Q. I see. Now, then, when did this discussion—when was the first Turbett device made? A. That was made along in 1906; well, along in July some time. Q. Yes. As a matter of fact, this contract was dated back to July 6th, to take in the first one, was it not? A. That is about the size of it, yes. Q. At the time this contract was made, the Willamette were selling the Universal Friction Device, were they not? A. They were. Q. Now, in your combination, 'E. Turney & Son Combination Friction Device,' as it was on the market, the fixed screw member was attached to the frame, was it not? A. Yes. Q. In the Universal device, the fixed screw member was carried by the shaft, was it not? A. Yes, it was. Q. Now, the combination or composite device, which made the Turbett device, put the Universal feature, that is, the fixed screw member, on the shaft? . A. Yes. Q. And that was what made the combination device that you called the Turbett? That is, you had the follow-up mechanism that had been previously used on the E. Turney & Son combination friction device? A. All right. Q. And you had the fixed screw member mounted on the shaft, which was the essential feature of the Universal device? A. All right. Go ahead. Q. That made the composite device? A. Yes. Q. And that was the Turbett? A. That was the Turbett device."

So that the composite device consisted of Turney's holding device, that is, the mechanism that operated to hold the thrust fast after it had been set up by the applying device, and allowed the lever to be released

and the friction eliminated, and Corbett's device for mounting the thrust-screw and the active screw members on the drum-shaft. This was the machine called the "Turbett Friction Device." Henceforth the contract construes itself. It is simply that the parties, each being the owner of certain inventions, agreed to combine certain elements of the Turney invention with certain of the Corbett invention; and as to the composite device, resulting from the combination of elements, it was further agreed that certain royalties should be paid by the party manufacturing to the other party to the contract. The contract relates specifically to manufacture and use of the new or composite device, and does not affect the parties in their respective rights to continue in the manufacture, use, and sale under their original inventions. This construction was acted upon by the parties, for Corbett continued from the date of the contract to manufacture Universals, and there was no protest by the Turneys until a much later date. The Turneys ceased to manufacture under their patents, but did manufacture the Turbett, and presumably they were better satisfied with the Turbett for use and sale than with the former inventions.

Much stress is placed upon the last clause of the contract above quoted as evincing a purpose that all the parties should cease to manufacture under the patents intended to be comprised by the negotiations; but to my mind it does not bear that interpretation. It is agreed thereby "that the above combination of the said two patents and the manufacture therefrom of the Turbett Friction Device is for the mutual benefit of the parties," and it is further stipulated that neither of the parties, "without the written consent of the other, shall have the right to sell or dispose of any rights, interests or property therein whatsoever." The word "therein" obviously relates to the Turbett Friction Device, a composite product of the two patents, and not to the Turney and Corbett devices, or either of them, or any other, and the language of the clause has reference solely to this device, so that there is no contractual inhibition of either party against manufacture and sale under their respective inventions. The inhibition is against either party disposing of any interest in the Turbett device. Nor do I conceive the operation and effect of the contract to be an equitable transfer from either party to the other of any right or interest in his patent. It is tantamount to a license of each to use certain elements of the patent of the other for constructing the Turbett, and to that extent and in that way only.

Now, the device which is being manufactured by Smith & Watson Iron Works is the Turbett Friction Device without the follow-up or holding mechanism taken from the Turney invention. This device, as previously described, differs from the Corbett device only in that the circular nut affixed to the end of the shaft revolves with the shaft, but within the sleeve of the fixed screw member, which latter remains stationary, while in the Corbett device the nut or sleeve revolves about and outside of the fixed screw member, which is not a functional difference, but a mechanical equivalent only. The device, therefore, infringes the Corbett patent. Not only does it infringe such patent, but the Turneys are precluded from any sale or disposition of any interest therein by the very terms of the contract in question, and are also precluded by

the same contract from the manufacture or use of the same in that form.

The injunction should be decreed as prayed. The accounting is a matter for further inquiry.